## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEVIN BOWMAN** | : | **Civil Action** |
| | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **NO:** _____ |
| | : | |
| **CITY OF PHILADELPHIA ET AL.** | : | Formerly |
| | : | **Court of Common Pleas** |
| | : | **Trial Division—Civil** |
| | : | **November Term, 2023** |
| **Defendants** | : | No. 231102648 |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |

## NOTICE OF REMOVAL

**To the Honorable Judges of the United States District Court for the Eastern District of Pennsylvania.**

Pursuant to 28 U.S.C. § 1441, defendants, DETECTIVE DENNIS DUSACK, LIEUTENANT MICHAEL GROSS, and the City of Philadelphia, (hereinafter "petitioners"), through their counsel, Derek Kane, Deputy City Solicitor, respectfully petitions for the removal of this action to the United States District Court for the Eastern District of Pennsylvania.  In support thereof, defendants state the following:

1.      On November 27, 2023, Plaintiff initiated this action by Complaint in the Court of Common Pleas in Philadelphia, November Term, 2023; No. 231102648.  (Exhibit "A.")

2.      On January 15, 2024, Plaintiff served the Complaint on Defendant Gross and Defendant Dusask.

3.      On January 30, 2024, Plaintiff served the Complaint on the City of Philadelphia.

4.      In Counts I, II, III and IV, Plaintff seeks relief against petitioners DETECTIVE DENNIS DUSACK and LIEUTENANT MICHAEL GROSS pursuant to 42 U.S.C. § 1983 for alleged deprivations of his rights protected by the Constitution of the United States.  See Exhibit

A.

5.     In Count V of the Complaint, Plaintiff seeks relief against the petitioner City of Philadelphia pursuant to 42 U.S.C. § 1983 for alleged deprivations of his rights protected by the Constitution of the United States.  See Exhibit A.

6.     28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

7.     The United States District Court for the Eastern District of Pennsylvania has original jurisdiction over the claims alleged by Plaintiff, pursuant to 28 U.S.C. § 1331.

8.     No other Defendants have been served process, and so their consent is not required for this removal according to 28 U.S.C. § 1446(b)(2)(a).

9.     True and correct copies of this Notice of Removal with accompanying exhibits and separate Notice to State Court of Filing of Notice of Removal, a copy of which is attached hereto as Exhibit "B," will be served upon the plaintiff and filed with the Prothonotary of the Court of Common Pleas of Philadelphia County, Pennsylvania, in accordance with the provisions of 28 U.S.C. § 1446(d).

10.     In filing this Notice of Removal, the petitioner does not waive any available defenses in this action.

**Wherefore,** petitioners respectfully requests that the captioned Complaint be removed to the United States District Court for the Eastern District of  Pennsylvania.

Respectfully submitted,

BY:        _/s/ Derek Kane_____
           **Derek Kane**
           **Deputy City Solicitor**
           **Attorney I.D. No. 316941**
           City of Philadelphia Law Department
           1515 Arch Street, 14th Floor
           Philadelphia, PA  19102
           215-683-5374

Date:  February 12, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN BOWMAN** | : | Civil Action |
| | : | |
| | : | |
| **Plaintiff** | : | : |
| **v.** | : | NO: _____ |
| | : | |
| **CITY OF PHILADELPHIA ET AL.** | : | Formerly |
| | : | **Court of Common Pleas** |
| | : | **Trial Division—Civil** |
| | : | **November Term, 2023** |
| **Defendants** | : | **No. 231102648** |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |

<u>NOTICE OF FILING OF REMOVAL</u>

TO:

| ALAN J. TAUBER, ESQUIRE | ZAK T. GOLDSTEIN, ESQUIRE |
|---|---|
| Law Office of Alan J. Tauber, P.C. | Goldstein Mehta LLC |
| 718 Arch Street, Suite 702 | 1717 Arch Street, Suite 320 |
| Philadelphia, PA 19106 | Philadelphia, PA 19103 |

PLEASE TAKE NOTICE THAT on February 12, 2024 the defendant, City of Philadelphia, filed, in the office of the Clerk of the United States District Court for the Eastern District of Pennsylvania, a verified Notice of Removal.

A copy of this Notice of Removal is attached hereto and is also being filed with the Clerk of the Court of Common Pleas of Philadelphia County, pursuant to Title 28, United States Code, Section 1446(e).

BY:          */s/ Derek Kane*_____
**Derek Kane**
**Deputy City Solicitor**
**Attorney I.D. No. 316941**
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA  19102

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN BOWMAN** | : | Civil Action |
| | : | |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | NO: _____ |
| | : | |
| **CITY OF PHILADELPHIA ET AL.** | : | Formerly |
| | : | **Court of Common Pleas** |
| | : | **Trial Division—Civil** |
| | : | **November Term, 2023** |
| **Defendants** | : | **No. 231102648** |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |

## CERTIFICATE OF SERVICE

I, Derek Kane, Deputy City Solicitor, do hereby certify that a true and correct copy of the attached Notice of Removal has been served upon the plaintiff's attorney on the date indicated below via email:

TO:

| | |
|---|---|
| ALAN J. TAUBER, ESQUIRE<br>Law Office of Alan J. Tauber, P.C.<br>718 Arch Street, Suite 702<br>Philadelphia, PA 19106 | ZAK T. GOLDSTEIN, ESQUIRE<br>Goldstein Mehta LLC<br>1717 Arch Street, Suite 320<br>Philadelphia, PA 19103 |

BY:       */s/ Derek Kane*_____
**Derek Kane**
**Deputy City Solicitor**
**Attorney I.D. No. 316941**

Date: February 12, 2024

Exhibit "A"

ZAK T. GOLDSTEIN, ESQUIRE
Goldstein Mehta LLC
1717 Arch Street, Suite 320
Philadelphia, PA 19103
267-225-2545 (p) 215-405-2559 (f)
ztg@goldsteinmehta.com
PA Bar # 312128

ALAN J. TAUBER, ESQUIRE
Law Office of Alan J. Tauber, P.C.
718 Arch Street, Suite 702
Philadelphia, PA 19106
215-575-0770 (p)
atauber@atauberlaw.com
PA Bar # 57353

Attorneys for Plaintiff Kevin Bowman

Filed and Attested by the
Office of Judicial Records
02 JAN 2024 10:29 am
G. IMBRIGIANI

---

KEVIN BOWMAN
Plaintiff

v.

DETECTIVE MARLENA MOSLEY,
DETECTIVE DENNIS DUSACK,
LIEUTENANT MICHAEL GROSS, and
CITY OF PHILADELPHIA
Defendants

PHILADELPHIA COUNTY COURT
OF COMMON PLEAS

CIVIL TRIAL DIVISION

November Term 2023
No. 02648

---

## PRAECIPE TO REINSTATE COMPLAINT

THE PROTHONOTARY:

    Kindly re-instate the complaint in the above captioned matter.

LINDY AND TAUBER

By:_____*Alan Tauber*_____
         Alan J. Tauber, Esquire

Dated:  January 2, 2024

1

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**NOVEMBER 2023**

E-Filing Number: 2311054780

**02648**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| KEVIN BOWMAN | CITY OF PHILADELPHIA |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| 5931 CARPENTER STREET PHILADELPHIA PA 19143 | 1515 ARCH STREET SUITE 15 PHILADELPHIA PA 19102 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| | MARLENA MOSELY |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| | 3211 CRANBERRY ROAD OLEAN NY 14760 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| | DENNIS DUSAK |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| | 1102 OAKFIELD LANE PHILADELPHIA PA 19115 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 1 | 4 | ☒ Complaint | ☐ Petition Action | ☐ Notice of Appeal |
| | | ☐ Writ of Summons | ☐ Transfer From Other Jurisdictions | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☐ Mass Tort | ☐ Commerce | ☐ Settlement |
| ☒ More than $50,000.00 | ☒ Jury | ☐ Savings Action | ☐ Minor Court Appeal | ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals | ☐ W/D/Survival |
| | ☐ Other: | | | |

CASE TYPE AND CODE

20 - PERSONAL INJURY - OTHER

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY** NOV **27** 2023 C. SMITH | IS CASE SUBJECT TO COORDINATION ORDER? YES   NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>KEVIN BOWMAN</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| ALAN J. TAUBER | LAW OFFICE OF ALAN J TAUBER TWO PENN CENTER, STE 900 PHILADELPHIA PA 19102 |
| PHONE NUMBER (215)575-0702 | FAX NUMBER (215)703-1675 | |
| SUPREME COURT IDENTIFICATION NO. 57353 | E-MAIL ADDRESS atauber@atauberlaw.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY ALAN TAUBER | DATE SUBMITTED Monday, November 27, 2023, 07:42 pm |

Case ID: 231102648

**COMPLETE LIST OF DEFENDANTS:**

1. CITY OF PHILADELPHIA
   1515 ARCH STREET SUITE 15
   PHILADELPHIA PA 19102
2. MARLENA MOSELY
   3211 CRANBERRY ROAD
   OLEAN NY 14760
3. DENNIS DUSAK
   1102 OAKFIELD LANE
   PHILADELPHIA PA 19115
4. MICHAEL GROSS
   4502 TALBOT STREET
   PHILADELPHIA PA 19136

Case ID: 231102648

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS OF PHILADELPHIA

Kevin Bowman

    Plaintiff

    v.

City of Philadelphia

Marlena Mosley

Dennis Dusack, and

Michael Gross

    Defendants

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| *You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.* | *Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.* |
| **Philadelphia Bar Association**<br>**Lawyer Referral**<br>**and Information Service**<br>**One Reading Center**<br>**Philadelphia, Pennsylvania 19107**<br>**(215) 238-6333**<br>**TTY (215) 451-6197** | **Asociacion De Licenciados**<br>**De Filadelfia**<br>**Servicio De Referencia E**<br>**Informacion Legal**<br>**One Reading Center**<br>**Filadelfia, Pennsylvania 19107**<br>**(215) 238-6333**<br>**TTY (215) 451-6197** |

Case ID: 231102648

ZAK T. GOLDSTEIN, ESQUIRE
Goldstein Mehta LLC
1717 Arch Street, Suite 320
Philadelphia, PA 19103
267-225-2545 (p) 215-405-2559 (f)
ztg@goldsteinmehta.com
PA Bar # 312128

ALAN J. TAUBER, ESQUIRE
Law Office of Alan J. Tauber, P.C.
718 Arch Street, Suite 702
Philadelphia, PA 19106
215-575-0770 (p)
atauber@atauberlaw.com
PA Bar # 57353

Attorneys for Plaintiff Kevin Bowman

| | |
|---|---|
| KEVIN BOWMAN<br>Plaintiff<br><br>v.<br><br>DETECTIVE MARLENA MOSLEY,<br>DETECTIVE DENNIS DUSACK,<br>LIEUTENANT MICHAEL GROSS, and<br>CITY OF PHILADELPHIA<br>Defendants | PHILADELPHIA COUNTY COURT<br>OF COMMON PLEAS<br><br>CIVIL TRIAL DIVISION<br><br>NO. |

## COMPLAINT

### Introduction

Plaintiff Kevin Bowman served more than 33 years of a life sentence because various Philadelphia Police Department Detectives framed him for the 1989 murder of Neil Wilkinson and shooting of Darryl Woods. He is innocent, but he spent his 25th through his 57th birthdays in state prison because the detectives falsified witness statements against him, perjured themselves at his trial, and withheld exculpatory evidence from the defense - including evidence of an alternate suspect who had made a confession to the murder and shooting.

1

Case ID: 231102648

Those egregious violations of Mr. Bowman's constitutional rights were not simply the product of a few bad officers gone rogue. Instead, they were the result of the City of Philadelphia's long-standing policy, practice, or custom of committing appalling constitutional violations in the investigation and prosecution of homicide cases. For decades, Philadelphia homicide detectives violated the constitutional rights of suspects, defendants, and witnesses to secure arrests and convictions – many of which were wrongful.

Mr. Bowman brings this suit to obtain some measure of justice from the City of Philadelphia and Philadelphia Homicide Detectives Marlena Mosley, Dennis Dusack, Chester Kochinski, and Lieutenant Michael Gross for the irreversible wrongs they perpetrated on him.

## Jurisdiction and Venue

1. The plaintiff and one or more defendants reside in Philadelphia County, so the Court has jurisdiction.

2. The actions and events giving rise to this cause of action occurred in Philadelphia, so venue lies in this Court.

## Parties

3. Plaintiff Kevin Bowman is, and at all times relevant to this Complaint was, a resident of Philadelphia, Pennsylvania. From 1989 to 2023, Mr. Bowman was incarcerated in the Philadelphia County Prison System and various Pennsylvania state correctional facilities as a result of his wrongful conviction for first degree murder.

4. Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania. It owns, operates, manages, directs, and controls the Philadelphia Police Department (PPD), which, at all times relevant to this complaint, employed defendants Marlena Mosley, Dennis Dusack, and Lieutenant Michael Gross as well as their co-conspirators, Detectives Thomas

2

Case ID: 231102648

Augustine, Chester Kochinski and Wayne McGlotten. Augustine, Kochinksi and McGlotten are all deceased.

5.     Defendant Marlena Mosely was at all relevant times employed as a detective with the PPD. Plaintiff sues her in her individual capacity.

6.     Defendant Dennis Dusack was at all relevant times employed as a detective with the PPD. Plaintiff sues him in his individual capacity.

7.     Defendant Michael Gross was at all relevant times employed as a lieutenant with the PPD. Plaintiff sues him in his individual capacity.

8.     Defendant Chester Kochinski was at all relevant times a homicide detective who participated in the investigation of the criminal case and conspired with fellow detectives to falsely convict Mr. Bowman. Detective Kochinski is deceased.

9.     Detective Thomas Augustine was a homicide detective who participated in the investigation of the criminal case, provided false testimony, and conspired with fellow detectives to falsely convict Mr. Bowman. Detective Augustine is deceased.

10.     Detective Thomas McGlotten was a homicide detective who participated in the investigation of the criminal case, provided false testimony, and conspired with fellow detectives to falsely convict Mr. Bowman. Detective Augustine is deceased.

## Statement of Facts

11.     Around 3:00 a.m. on March 13, 1989, Philadelphia police officers responded to reports of a shooting at the Richard Allen Homes. Inside, they found Neil Wilkinson dead and Darryl Woods shot numerous times but alive. Both were lying at the bottom of a stairwell. Investigators recovered five 12-gauge shotgun casings and four 10-millimeter fired cartridge casings.

12.     Mr. Woods suffered injuries to his left knee, left arm, stomach, and hip from six gunshot

3

wounds. Significantly, he suffered no injuries to his right arm. This fact that would become critical to Mr. Bowman's wrongful conviction and eventual exoneration. No one else was present in the hallway.

13.     During the following weeks, Mr. Woods received treatment for gunshot wounds at Hahnemann University Hospital. The treatment included numerous operations, but none of them impacted his ability to sign documents or write with his right hand.

14.     The previously mentioned detectives claimed to have interviewed Mr. Woods during his hospital stay and taken statements from him concerning the circumstances of the shooting and the identity of the gunmen. The detectives claimed that in some of these statements, Mr. Woods identified Mr. Bowman as one of the gunmen – a claim that Mr. Woods repeatedly denied in testimony under oath.

15.     The detectives turned over five statements that they alleged Mr. Woods made to them between March 21 and April 8, 1989 and which were later introduced at Mr. Bowman's criminal trial, notwithstanding the fact that Mr. Woods consistently denied having made the statements and specifically denied identifying Mr. Bowman as one of the gunmen.

16.     The defendant detectives who took these statements and their deceased co-conspirators all falsely testified at trial as to the authenticity of the statements.

17.     Counsel for Mr. Bowman at his criminal trial challenged the credibility of the detectives, and the entire defense rested upon whether their testimony concerning Mr. Woods's statements was true.

18.     Because the police and prosecutors hid evidence which would have shown that the detectives were lying, the jury ultimately believed the detectives and convicted Mr. Bowman of first-degree murder.

4

19.    This wrongful conviction stemmed from the fact that the defense and the jury were denied powerful exculpatory evidence that demonstrated that the detectives had lied about Mr. Woods's statements.

20.    That evidence remained hidden from view in both the detectives' file until it was made available to counsel for Mr. Bowman and his co-defendant, Anthony Reid, about 30 years later.

21.    The suppressed evidence consisted of 1) objective, uncontradicted medical evidence contained in the Mr. Woods's hospital treatment records that directly exposed the detectives' testimony and lies concerning Mr. Woods's cognitive and physical ability to make and sign a statement, 2) other statements from Mr. Woods concerning the circumstances of the shooting given to medical personnel and social workers during his hospital stay that were entirely inconsistent with the statements that the defendants claim to have taken, 3) a confession from an alternate suspect, 4) and expert handwriting analysis that failed to verify the signature of Mr. Woods on one of the statements that the detectives allegedly took from him.

22.    The prosecution of Plaintiff was built entirely on this collection of fabricated statements, and because there were no witnesses to the shooting, no conviction would have been possible without the defendant detectives' decision to falsely vouch for them.

23.    The suppressed evidence would have demonstrated that the defendants presented false testimony concerning the critical – and only – evidence of Mr. Bowman's guilt; it would have undoubtedly led to an acquittal had it been presented to the jury.

**Woods's first alleged hospital statement – 3/21/89 (unsigned)**

24.    Defendants Marlena Mosley and Thomas Augustine claimed to have taken Mr. Woods's first statement on March 21 at 11:30 a.m.

25.    Detectives Mosley and Augustine claimed that in that alleged statement, Mr. Woods told

Case ID: 231102648

them that two unnamed men drove him and decedent Wilkinson to the Philadelphia apartment complex known as the Richard Allen Homes. The statement goes on to note that the two unnamed men instructed Wilkinson and Woods to knock on an apartment door at the top of the stairwell and when the occupant answered, they were to pull him out of the apartment.

26.    According to this alleged first statement, Mr. Woods and Mr. Wilkinson walked up the stairs and knocked. While waiting for an answer, the two men shot them from the bottom of the stairs.

27.    According to the statement, the detectives then presented Mr. Woods with a book of 100 photographs. Mr. Woods pointed to a photograph of Plaintiff and said, "that one looks like one of them."

28.    At the end of this alleged statement, there is a line that reads "compl was unable to sign this interview."

### Woods's second alleged hospital statement - 3/21/89 (unsigned)

29.    Defendants Mosley and Dusak claim to have taken Woods's second statement on the evening of March 21—the same day as his first statement.

30.    They claimed that Mr. Woods gave fundamentally the same story with some added detail, but he still did not identify the men who shot him and the decedent.

31.    Mr. Woods allegedly again stated that the person in a photograph of Mr. Bowman looked like the "bigger" of the two shooters, but he did not make a positive identification. This statement also included a line stating "complainant was unable to sign this statement."

### Woods's third alleged hospital statement - 3/22/89 (unsigned)

32.    Detective Wayne McGlotten allegedly obtained a third statement from Mr. Woods the following day.

33.     Detective McGlotten wrote that Mr. Woods provided the same description of the events leading up to the shooting, but for the first time, he named the two people who picked him up as "Tone" and "Black."

34.     Detective McGlotten further wrote that Mr. Woods told him that the two men intended to collect a debt from the apartment occupant. He also said that Black used the shotgun and that Black's first name was "Kevin." Thus, Mr. Woods's third statement contained the first evidence regarding the identity of the shooters. Again, at the bottom of the statement, Detective McGlotten wrote that "subj could not sign statement."

### Woods's fourth hospital statement - 3/23/89 (signed)

*35.*     Defendant Moseley wrote that Mr. Woods gave a fourth statement to her which she dated as occurring on March 23 at 8:00 p.m.

*36.*     Unlike the prior alleged statements, the first half of this statement is typed while the second half is handwritten.

37.     Defendant Mosley would later testify that this anomaly stemmed from the fact that this single statement was actually taken at two different times. The first half came from an interview which occurred on the evening of March 23 during which she took notes by hand that she later typed at her office. This statement, again, was unsigned by Mr. Woods.

38.     Detective Mosely claimed that she then returned the next day to ask follow-up questions, hand wrote those questions and answers, and then asked Mr. Woods to sign. She said he signed, but police later sent even this supposedly signed statement out for expert handwriting comparison. They never told the defense that they had done so, and they sat quietly while the prosecutor claimed in closing arguments that if he had any doubts about the validity of the statement, he would have had the signature examined.

7

39.    All six pages of that statement purport to bear a signature for Darryl Woods.

40.    In this fourth statement, detectives alleged that Mr. Woods gave his most comprehensive account of the shooting.

41.    They alleged he repeated all the details about how "Black" aka "Kevin" and "Tone" took him and the decedent to the top of a staircase at Richard Allen Homes.

42.    The false statement says that while waiting for an answer at the apartment door, Mr. Woods heard the shotgun click and then felt a shot in his left knee and saw the decedent Wilkinson getting shot.

43.    Mr. Woods sustained additional gunshot wounds to his hip, stomach, and left arm.

44.    The statement notes that after rolling down the steps with decedent, Tone shot both of them again with a pistol and Mr. Woods pretended to be dead until Black and Tone departed.

45.    Defendant Mosely wrote that while giving this statement, Mr. Woods positively identified a photograph of Mr. Bowman as "Black."

46.    According to the Woods statement, Junior Black Mafia ("JBM") leaders Leroy Davis and Rodney Carson ordered the murder because they suspected that Mr. Woods and decedent Wilkinson were providing incriminating information about the JBM to police. Mr. Woods had been arrested and taken into custody by the police a week before the shooting.

47.    The fourth alleged statement from Mr. Woods did not include the identification of any photograph of the shooter he called "Tone."

### *Woods's fifth hospital statement – 4/8/89 (unsigned)*

48.    Detective Kochinski and Defendant Gross claimed to have taken Mr. Woods's fifth and final statement on April 8, 1989.

49.    In this fifth alleged statement, Kochinski and Gross state that Mr. Woods positively

8

Case ID: 231102648

identified a photograph of co-defendant Reid as the second shooter: "That's 'Tone' – he shot Neal."

50.    The detectives testified at trial that they asked Mr. Woods to sign, but Mr. Woods responded that he could not do so due to a recent skin graft operation involving his hand.

51.    While Mr. Woods did receive a skin graft on his right hip, it had no effect whatsoever on his right hand or right arm which he used to write.

52.    Based virtually entirely on Woods's statements discussed above, Philadelphia Police obtained an arrest warrant for Plaintiff charging him with murder.

### The Trial

53.    Plaintiff and his co-defendant, Anthony Reid, proceeded to a joint jury trial.

54.    After invoking the Fifth Amendment at Plaintiff's preliminary hearing, Mr. Woods was immunized, and he testified pursuant to subpoena at trial.

55.    As stated above, the prosecution case at trial was dependent upon the credibility of the detectives who testified about the five statements that they claimed to have taken from Mr. Woods.

56.    In his opening statement, Plaintiff's criminal trial counsel specifically told the jury that it would not be able to trust Mr. Woods' statements.

57.    In response to a motion to preclude Mr. Woods' statements, the trial judge aptly stated that "If [the jury] concludes that the police lied and in fact this document they are handing up is not their statement, then there is nothing to believe."

58.    At trial, Mr. Woods testified that he and the decedent were shot by two unknown men.

59.    The prosecutor then impeached Mr. Woods with the five out-of-court statements attributed to him while he was hospitalized. These statements provided the only identification

evidence of either defendant at trial.

60.     At trial, Mr. Woods expressly denied making unsigned statements one through three.

61.     When confronted with the fourth statement, Mr. Woods confirmed its existence.

62.     He acknowledged being interviewed by a female detective and a bald detective. This matched the officers' testimony that Detective Mosley (a woman) and Detective McGlotten (a bald man) took the fourth statement.

63.     Mr. Woods, however, testified that he did not "remember what was said" because he had just come from surgery. He stated that multiple recent surgeries prevented him from recalling what he said during the fourth statement. He said he was "dizzy" at the time and noted that Detective Mosley was already waiting in his hospital room as soon as he returned from surgery.

64.     Mr. Woods confirmed that he positively identified a photograph of Mr. Bowman at some point as put forth in the fourth statement, but he testified that he intended to identify Mr. Bowman only as someone he was with prior to the shooting, not as the actual shooter.

65.     Mr. Woods also testified that he signed only the last page of the fourth statement – not the preceding five pages. He testified that he did not read the contents of the statement prior to signing, that the police came up with their own answers to their questions, and that he never made the statements attributed to him in the statement.

66.     He testified that he signed that final page only after "two white male detectives came in" and told him that if he "didn't talk to them and tell them what happened, they were going to lock [him] up" for an open bench warrant and that he "should sign what [he] had told Detective Mosely."

67.     Mr. Woods then added that he was not aware of what they wanted him to sign and that he did not believe he was presented with the other five pages

10

Case ID: 231102648

68.     With respect to the fifth statement, wherein Mr. Woods identified co-defendant Anthony Reid as one of the shooters, Mr. Woods testified that he did not provide a statement to those two detectives.

69.     He confirmed that he identified a photograph of co-defendant Reid at some point, but he again said he intended only to identify Mr. Reid as a companion on his trip to the Richard Allen Homes and not as one of the gunmen.

70.     Mr. Woods testified that the interviewing officers kept telling him that Plaintiff and Mr. Reid were the ones who had shot him: "They were telling me that I knew that they were the ones that killed [decedent] Wilkinson and shot me and that I should tell Detective Mosley that and that no matter what my condition is if I don't, they are going to lock me up, whether I was paralyzed or not." At that time, Mr. Woods could not walk.

71.     After Mr. Woods denied having made the proffered statements, the Commonwealth called every detective and officer who claimed to have participated in taking a hospital statement from him. This included each of the detectives.

72.     All testified that Mr. Woods was alert and gave the statements voluntarily, that he reviewed the statements when they were held up for him to read, that he could not sign the first three statements due to his right arm being immobilized with an intravenous injection or because it was bandaged, and that he could not sign the fifth statement due to his recent skin graft operation.

73.     Had the defense been provided with the medical records, this testimony would have been directly contradicted by the fact that Mr. Woods signed multiple consent to medical treatment forms on days before, during, and after the oral statements were supposedly taken.

74.     Detectives Mosley and McGlotten testified that they saw Mr. Woods sign every page of

11

the fourth statement.

75.     When pressed, Detective Mosley said that Mr. Woods could not sign the fourth statement on March 23 because his right arm was attached to an "intravenous board." She insisted that he could sign it on March 24 because that board had been removed.

76.     Detective Mosley testified that March 21, 1989 – the date of Mr. Woods's first statement – was the "[f]irst time [she] talked to him."

77.     She explained that between March 13 and March 21, she saw Mr. Woods but "just went into his room to check on him."

78.     She testified that she did not interview Mr. Woods until March 21 because Mr. Woods "had a tube down his throat" preventing him from speaking until March 21.

79.     Notes and interviews with medical staff as reflected in the medical records indicate that Mr. Woods was able to write notes and answer questions in writing during the time for which he was intubated.

80.     Defendant Mosely admitted that Mr. Woods did not sign the fourth statement until March 24, even though it was dated March 23.

81.     When asked why she did not ask him to sign the three other unsigned statements from March 21 and 22, she testified that it would have been wrong to bring older statements to be signed on a later date.

82.     She attempted to reconcile this position with her decision to have Mr. Woods sign the March 23 statement on March 24 by referencing the additional questions she supposedly asked on March 24.

83.     Detective Mosley also misstated the dates on which she spoke with Mr. Woods and the date that Mr. Woods signed the fourth statement. She explained that she took handwritten notes

12

Case ID: 231102648

that she then used to type the statements presented at trial. Of course, she discarded the handwritten notes. She acknowledged that she did not record the presence of Detective McGlotten anywhere on the fourth statement even though she claimed he was present for both stages of its fabrication.

84.     The only other alleged evidence introduced at trial against Plaintiff came from a search of his home and the corresponding testimony of Detective Ernest Bethea.

85.     Police claimed they searched Plaintiff's residence and found four 12-gauge shotgun shells and 16 nine-millimeter bullets. The shells, however, came from a different manufacturer than those found at the scene of the shooting.

86.     Indeed, a firearms expert testified that the 9-millimeter bullets recovered from Mr. Bowman's residence were too small to have been fired from a ten-millimeter gun and did not match the ten-millimeter fired cartridge casings recovered at the crime scene.

87.     Detective Bethea also testified that he spoke to Mr. Woods prior to the shooting when Mr. Woods was arrested on unrelated weapons offenses.

88.     Over objection, Detective Bethea was permitted to relay the content of his unrecorded conversation with Woods. (As an unrecorded statement, it would not be admissible under current legal precedent).

89.     Detective Bethea testified that he asked Mr. Woods to share information regarding the JBM and gave him a week to talk it over with his family. The day of the shooting – March 13 – was the day they were supposed to meet again. However, the prosecution and its witnesses provided no explanation as to how anyone would have acquired knowledge of this potential cooperation (and thereby how it could have served as a motive), if it in fact even occurred.

90.     In his closing argument, the prosecutor stressed the importance of Mr. Woods'

13

out-of-court statements and urged the jury to accept them for the truth. He urged the jury to reject Mr. Woods's in-court testimony.

91.     The prosecutor also discounted the possibility that Mr. Woods and the others were potentially visiting a girlfriend. The prosecutor dismissed this theory as "nonsense" because there was "no evidence" to support it. The detectives remained silent despite knowing that there was such evidence - Mr. Woods's medical records showed that he had had said as much to hospital personnel, and he said similar things to the detectives.

92.     As would become a pattern, evidence in the files of the detectives and the prosecutor that was never turned over to the defense demonstrates that 1) Mr. Woods's testimony should have been believed over the false statements that detectives claimed to have taken; and 2) contrary to the prosecutor's express statement, there was in fact evidence that the shooting was linked to a woman that Mr. Woods was visiting.

93.     The prosecutor also stated in his closing that he did not present a handwriting expert to verify Mr. Woods's signatures on the signed statement because he did not believe an expert was necessary. He argued that it was sufficient that the detectives testified that they watched Mr. Woods sign and that Mr. Woods himself admitted signing the last page.

94.     The prosecutor argued this at the same time that he had an undisclosed, inconclusive handwriting comparison in his file for that very statement. That handwriting comparison had been commissioned by the police.

95.     There was no physical or forensic evidence linking Mr. Bowman to the shootings.

96.     As a result of their coercive, deceitful police work, perjury, and the concealment of the same from the judiciary, the jury, and the defense, Mr. Bowman was wrongfully convicted of Neil Wilkinson's murder and the shooting of Mr. Woods and sentenced to life without parole.

14

**Undisclosed Material That Contradicts Defendants' Trial Testimony**

97.    The Commonwealth investigative files contained undisclosed material that, if presented to the jury, would have resulted in an acquittal.

98.    This suppressed evidence begins with medical records that conclusively demonstrate that Mr. Woods was physically able to sign his hospital statements. Indeed, he signed the records themselves, directly contradicting the defendants' testimony and supporting Plaintiff's claim that defendants' fabricated evidence to bring the charges against him and then deny him a fair trial.

99.    First, Mr. Woods's hospital records contained medical forms that Woods *did* sign. Mr. Woods signed these forms on the days immediately preceding and following the days when he gave unsigned statements to police. These hospital forms are dated March 16, March 18, April 11, April 22, and April 25, 1989. All of them bear Mr. Woods' signature.

100.    Mr. Woods' hospital records also contain nursing notes from March 21, March 22, and March 23, 1989, stating that Mr. Woods "moves R arm & leg well." Mr. Woods is right-handed, and these dates match the dates when the first three police statements were taken and when the first half of the fourth statement was taken, i.e., the same dates when the police later testified that Mr. Woods *was unable* to sign due to his medical condition

101.    In addition to the hospital records, the investigative files contained a 75-483 statement given by one of Mr. Woods's doctors to Detective Mosley. In that statement, the doctor detailed the morphine doses Mr. Woods received from March 21 to March 24, i.e., the same dates when police took the first four statements. Mr. Woods received six doses of morphine on March 21, seven doses on March 22, three doses on March 23, and five doses on March 24. The physician told Detective Mosely that these doses could have had a "possible" effect on Mr. Woods.

102.    In addition to the hospital records, the Commonwealth's file contained a statement that a

Case ID: 231102648

nurse who treated Mr. Woods in the ICU on March 13, 1989, gave to Detective Mosley. The nurse stated that while in the ICU, Mr. Woods had a tube in his throat that prevented him from speaking, but that he was still able to communicate by writing notes.

103.    With respect to the fourth, supposedly signed, statement, defendants' testimony that Mr. Woods was in clear state of mind when he made that statement – an assertion he denied – was also revealed by the medical records to be false.

104.    The Commonwealth's file also contained two reports prepared by a handwriting expert at Detective Kochinski's request in order to verify Mr. Woods's signatures on the one statement that he signed (the fourth statement). In order to determine the authenticity of Mr. Woods's signature, the Commonwealth provided the expert with authentic exemplars of Mr. Woods's signature. Seven of these exemplars were medical documents signed by Mr. Woods other than the five signed medical forms found in the Commonwealth's trial file. The handwriting report states that Mr. Woods made these signatures on March 14, March 20, March 30, April 5, and April 30. On the first submission, the handwriting examiner concluded that pages 1 through 3 of the fourth statement bore Mr. Woods's authentic signature, but he could not reach a conclusion about pages 4 through 6. On the second report, which was generated after the Commonwealth submitted additional exemplars, the handwriting examiner concluded that all six pages bore Mr. Woods's authentic signature

105.    There was also a handwritten note in the Commonwealth's trial file asking the obvious. It stated: "signed Hosp papers prior to 21—Why could not sign on 21st?"

### Woods' undisclosed prior inconsistent statements

106.    The Commonwealth also did not disclose two additional hospital statements from Mr. Woods in which Mr. Woods gave a different account of the shooting and did not identify either

defendant as a shooter. This is further evidence that the detectives fabricated the statements that Mr. Woods denied making.

107.    In both undisclosed statements, Mr. Woods claimed that he recently met a woman named "Tanya," who lived in the Richard Allen Homes.

108.    On the night of the shooting, Mr. Woods and the decedent went to see her. According to these statements, two unknown men shot Mr. Woods and decedent Wilkinson while they were standing outside this woman's apartment. Notably, Defendant Mosley interviewed a 20-year-old woman named Tanya Fenwick who lived at the Richard Allen Homes following this shooting.

109.    Although the Commonwealth provided the Tanya Fenwick interview in pre-trial discovery, that interview was unaccompanied by Mr. Woods's statements in which he claimed to be visiting someone by that name, so the defense could not have recognized its import. Ms. Fenwick described hearing the shooting and looking out her window to see the dark outlines of people fleeing.

110.    Mr. Woods first relayed the "Tanya version" in an undated interview conducted by an unidentified police officer who recorded it on the standard interview form used by the Philadelphia Police Department.  The interview bears the handwritten heading of "Derrell Wood." The second statement appears in Mr. Woods's medical records.

111.    In that second statement from the medical records, Mr. Woods apparently shared the same story with his hospital social worker on April 14, 1989 (i.e. six days after statement five). The social worker documented this statement in Woods's medical records. The statements were not disclosed to the defense.

112.    The "Derrell Wood" police interview also shows that Mr. Woods communicated with the police by writing while he was intubated. Therefore, this interview suggests that the police knew

17

Mr. Woods could write – contrary to the officers' trial testimony that he was medically unable to sign his unsigned statements.

113.    The "Derrell Wood" statement is six pages long and consists of three distinguishable sections. The first page simply contains questions, without any answers. The questions are written in neat handwriting and bear the title, "Questions for Derrell Wood." The next three pages (pages 2–4) are in the same neat handwriting and bear the heading of "Darrell Wood." These pages repeat the same questions that appear on the first page. However, unlike the first page, these pages also contain neatly written answers beneath each question. Both the questions and the answers are in the same handwriting. The final two pages (pages 5–6) are written in a different, sloppier handwriting characterized by large, looping letters and crooked words. In this sloppy handwriting, these final two pages contain the same answers that are neatly written on pages 2–4, only this time without the questions.

114.    It is apparent that a police officer with neat handwriting copied onto pages 2–4 the answers that Mr. Woods wrote in sloppy handwriting on pages 5 – 6, which is consistent with the ICU nurse's recollection that he communicated by writing while intubated.

115.    An equally reasonable inference from these pages is that a detective – possibly assigned Detective Mosley – posed questions to Mr. Woods, to which Mr. Woods answered, in sloppy writing, while he was intubated and could not speak.

116.    It therefore follows that Mr. Woods could, in fact, sign his name when the five hospital statements were taken and that the defendants knew that.

117.    Finally, in one additional category of suppressed exculpatory evidence that would have cast doubt on the testimony of the defendants, the prosecution hid from the plaintiff evidence that a man named Daniel Tyson admitted to the shooting to a police officer shortly after the incident.

18

118.    At the direction of the homicide detectives, the officer transported Mr. Tyson to a police district. That officer signed a statement and created an incident report which was only recently disclosed to Plaintiff.

119.    In 2021, about 30 years after the trial, the Commonwealth made the files available and disclosed the exculpatory evidence.

120.    On March 12, 2022, Plaintiff filed an amended Post-Conviction Relief Act ("PCRA") Petition in the Philadelphia Court of Common Pleas alleging that he was denied his constitutional rights to a fair trial due to the exculpatory evidence that had been suppressed and its obvious materiality to the issues in question at his criminal trial.

121.    On October 31, 2022, the Commonwealth conceded that the prosecution's conduct violated Plaintiff's constitutional rights to a fair trial and agreed that his conviction should be vacated.

122.    On February 3, 2023, the Court of Common Pleas granted the PCRA petition and ordered that Plaintiff receive a new trial.

123.    Thereafter, the Philadelphia District Attorney moved to dismiss the charges against Plaintiff.

124.    On March 8, 2023, the Philadelphia Court of Common Pleas granted the *nolle prosse* motion and dismissed all charges against Plaintiff.

### The PPD's Pattern and Practice
### of Unconstitutional Misconduct in Homicide Investigations

125.    For decades before the investigation of the murder of Mr. Wilkinson and the shooting of Mr. Woods and for years following it, the City of Philadelphia had in force and effect a policy, practice, and custom of unconstitutional misconduct in homicide investigations.

Case ID: 231102648

**126.** That policy, practice, or custom involved: using coercive techniques in interviews and interrogations to obtain statements and confessions; fabricating inculpatory evidence; withholding exculpatory evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees by, amongst other means, feeding details about the crime that police knew (or more often, believed to be true) to those witnesses, suspects, and arrestees.

**127.** This policy, practice, or custom involved fabricating, withholding and hiding evidence from the prosecution and defense lawyers for the accused leading up to and at trial and continuing with post-conviction counsel for decades, including, without limitation: interview reports, medical records photographs, forensic analyses, circumstances of statements and confessions, facts on how statements and confessions were coerced or altered, and what promises were made to obtain confessions or incentivize witnesses.

**128.** This policy, practice, or custom involved the use of various techniques to obtain false statements, including, but not limited to: isolation; separating vulnerable suspects or witnesses from their friends and family; intentionally interrogating those in custody without first advising them of their *Miranda* rights; threatening witnesses and suspects with criminal prosecution; intentionally advising witnesses of their *Miranda* rights to create the impression that they would be charged with a crime if they did not comply with investigators' demands; subjecting individuals to needlessly and deliberately prolonged interrogations; unlawful detention; denial of legal counsel; making false promises, including the promise that a suspect or witness will be allowed to go home if they make an inculpatory statement; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence; providing false assurances to vulnerable people and others, and that they

Case ID: 231102648

would benefit from making an inculpatory statement minimizing their own involvement and simply obtaining and vouching for false statements from victims and witnesses.

129.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation: fabricating detailed statements based on alleged facts previously known to police; providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation; selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation, and rehearsal; misrepresenting that a suspect's or witness's formal statement was a verbatim statement in their own words; misrepresenting the contents of witnesses unsigned statements; obtaining signed statements containing false information from witnesses without having them actually review the statement; withholding evidence from the defense that would undermine and impeach the credibility of the officers vouching for the police version of the statements.

130.    At the time of the investigation into the Wilkinson murder and Woods shooting, these practices had long been well known to the City of Philadelphia and its policymakers due to newspaper investigations (including Pulitzer Prize-winning reporting in the *Philadelphia Inquirer* in 1977 and 1978), governmental investigations, complaints from lawyers and civilians, civil and criminal litigation of such claims, and internal police investigations.

131.    The misconduct described in this Complaint was committed with the knowledge of and in full view of Homicide Unit and PPD supervisors, because of their deliberate indifference to it, or through affirmative encouragement and instruction.

Case ID: 231102648

**132.**   The Philadelphia Police Department, the Homicide Unit and the City of Philadelphia effectively fostered a culture of impunity among Homicide Unit personnel by intentionally ignoring or consciously disregarding constitutional and other legal restrictions on homicide detectives' misconduct in the interest of closing cases.

**133.**   Various cases demonstrate that the above-described misconduct was pervasive within the PPD at the time of the investigation in this case.

**134.   Herbert Haak and Robert Wise:**   Detective Augustine, one of the detectives in the present complaint, took the statements of Herbert Haak and Robert Wise in the infamous 1995 "center city jogger" case. Both before and at trial, Mr. Haak testified that Detective Augustine beat him during an interrogation and forced him to sign blank pages upon which confessions were typed later. Mr. Haak and Mr. Wise were acquitted at trial after DNA evidence demonstrated their innocence, and they then sued Augustine under 42 U.S.C. § 1983. The case ended in a settlement. *See* Order, *Haak v. City of Philadelphia*, No. 97–6634 (E.D. Pa. Dec. 7, 2007).

**135.   Bobby Harris:**   A fifteen-year-old named Bobby Harris complained at his murder trial in 1989 that Augustine used racial epithets, obscenities, and threats to coerce his confession. *See Hill v. Wetzel*, 279 F.Supp.3d 550 (E.D.Pa. 2016) (Decl. of Bobby Harris, ECF Doc. 10–2 at 87).

**136.   Marvin Woods:**   Mr. Woods, who was convicted for a September 1991 shooting on a South Philadelphia playground, has also asserted that Det. Augustine engaged in "malicious misconducts" and "fabrication of evidence." *See Commonwealth v. Woods*, 1367 EDA 2012, 2013 WL 11272488 (Pa. Super. 2013).

**137.   Anthony Wright:**   In 1991, PPD homicide detectives including Detective Augustine framed Mr. Wright for the rape and murder of an elderly woman. The detectives engaged in

22

serious investigative misconduct, including coercing witnesses. Mr. Wright alleged that Detective Augustine conspired to manufacture sworn statements and testified at trial that he recovered alleged bloodstained clothing from Mr. Wright's bedroom when his colleagues actually recovered it from the scene of the crime. *See* Complaint, *Wright v. City of Philadelphia*, No. 16–5020 (E.D. Pa. Sept. 20, 2016). Mr. Wright was wrongfully convicted in 1993 of the rape and murder. After spending nearly twenty-five years in prison, in 2016, Mr. Wright was exonerated by DNA evidence that identified the true perpetrator of the rape and murder. Mr. Wright brought a civil rights action that settled for more than $9,000,000.

138.    **Andrew Swainson:** In 1989, PPD homicide detectives framed Andrew Swainson for a murder he did not commit. Detective Santiago used direct suggestion to compel a single eyewitness (and original suspect who had been arrested for the shooting moments after it occurred, covered in blood and running from the scene) to implicate Mr. Swainson. Detective Santiago lied and claimed the identification had been from a non-suggestive photo identification procedure. Based on this fabricated and coerced evidence, Mr. Swainson was wrongly convicted of the murder in March 1989 and sentenced to life imprisonment. Mr. Swainson was recently exonerated and released from prison after serving more than 30 years for a crime he did not commit. Mr. Swainson has brought a civil rights action that is pending.

139.    **Walter Ogrod:** In 1992, PPD homicide detectives coerced and fabricated a false confession from Mr. Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Mr. Ogrod had driven all night and had not been to bed in 36 hours when homicide detectives Devlin and Worrell, who had worked with other detectives on the Wright and Swainson cases, interrogated Mr. Ogrod for hours. They then wrote out a fabricated statement they falsely claimed was a verbatim record of a voluntary statement from Mr. Ogrod

23

and coerced Mr. Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the Commonwealth convicted Mr. Ogrod of capital murder. Mr. Ogrod has recently been exonerated and released from prison after serving more than 25 years for a crime he did not commit. Mr. Ogrod brought a civil rights action that is pending in this Court.

140.   **Johnny Berry:** In another homicide case underscoring serious misconduct by homicide detectives Jastrzembski and Santiago, Mr. Berry was convicted of a 1994 murder based on the testimony of witnesses who had been coerced, and where exculpatory evidence had been concealed for many years after trial. The three eyewitnesses – Omar Williams, Michelle Brooks, and Tauheed Lloyd – described the ways in which detectives used coercion and improper identification procedures to induce them to falsely implicate Mr. Berry, and to later conceal evidence of this misconduct. Ultimately, Mr. Berry was exonerated following a reinvestigatyion of his case and he brought federal civil rights claims against the City and the detectives, securing a favorable settlement.

141.   **Shaurn Thomas and Mustafa Thomas:** In 1992, PPD homicide detectives framed brothers Shaurn and Mustafa Thomas for a 1990 shooting murder they did not commit. In October 1992, homicide detectives Devlin and Worrell coercively interrogated John Stallworth – including hitting him with a telephone book and squeezing his testicles – to coerce him to confess to a role in the murder and falsely implicate Shaurn and Mustafa Thomas in the crime. All the facts in the statement were provided by detectives Devlin and Worrell and falsely attributed to Mr. Stallworth. Detectives then coerced and fabricated a matching statement from John Stallworth's brother, William Stallworth. In 1994, both Thomas brothers were wrongly convicted based on this fabricated and coerced evidence and sentenced to life imprisonment.

24

After spending 25 years in prison, Shaurn Thomas was exonerated in 2017; subsequently, Mustafa Thomas's conviction was also vacated and charges against him dismissed. Mr. Thomas brought a civil rights action that settled for $5,000,000.

142. **Willie Veasy:** In 1993, Mr. Veasy was convicted of second-degree murder in connection with a January 1992 shooting in which John Lewis was killed and Efraim Gonzalez wounded. Mr. Veasy was sentenced to life imprisonment without the possibility of parole. Although Mr. Veasy signed an inculpatory statement written out by homicide Detective Devlin during the investigation, he retracted this statement as false and has maintained his innocence ever since. Mr. Veasy brought a civil rights claim that settled for $5,000,000.

143. **Carlos Hernandez/Tonez:** A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. A homicide detective coerced a key witness, Juan Sanchez, into falsely implicating Carlos Hernandez and another man by holding Mr. Sanchez in custody and interrogating him for three days, without food or water, hitting him several times, and denying him use of the bathroom so that he had to urinate on the floor. After coercing Mr. Sanchez's statement, the detective coerced Mr. Hernandez into providing a statement implicating Ed Williams, including by handcuffing him to a chair and holding him without water, food, or use of a bathroom and punching him in the face and pressing his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later, it was proven that Mr. Williams was in a secured drug treatment facility at the time of the crime.

144. **Jackie Combs Jr.:** PPD detectives coerced four young witnesses into testifying against Mr. Combs for a 1990 murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy knowing he didn't do it." The witnesses, who gave varied accounts of the killing,

have explained that their statements were the result of physical and verbal abuse by detectives. The homicide detective's affidavit of probable cause omitted material information, including that witnesses reported it was a murder-suicide until pressured to change their statements.

145.   **Percy St. George:** In 1993, a homicide detective obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the real David Glenn. At the station, the detective coerced Mr. Glenn into signing a false statement identifying Mr. St. George from a sham photo array prepared by the detective. After Mr. Glenn testified in an October 1993 hearing regarding the detective's misconduct and disavowed the statement by the detective had coerced him to sign, the detective notified the court and the prosecutor of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about his actions in that case. Shortly after receiving this letter from the detective's counsel, the prosecution dismissed all charges against Mr. St. George.

146.   **Chester Hollman:** PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness to provide a false statement implicating the innocent Mr. Hollman and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Mr. Hollman's innocence. In 2019, Mr. Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned. Mr. Hollman's civil rights action settled for more than $9,000,000.

147.   **Terrence Lewis:** PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Mr. Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding

26

key exculpatory evidence that would have demonstrated Mr. Lewis's innocence. In 2019, Mr. Lewis was exonerated after he had spent 21 years wrongly imprisoned.

148.    **Donald Ray Adams:** Mr. Adams was convicted of the 1990 murders of Darryl Patterson and Thomas Winn. PPD detectives coerced a false statement from an alleged witness, Donna Benjamin, implicating Mr. Adams, and Mr. Adams was convicted based almost entirely on this evidence. Ms. Benjamin subsequently recanted in 2007, and Mr. Adams was granted post-conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20s. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30s. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a 2011 retrial, Mr. Adams was acquitted of all charges. In a subsequent civil suit, the matter was settled.

149.    **John Miller:** In June 1997, Mr. Miller was arrested for the 1996 murder of Anthony Mullen based on a fabricated statement PPD detectives had coerced from alleged witness David Williams. Mr. Williams recanted during a 1997 preliminary hearing and at trial in 1998 and testified that detectives had threatened him and fed him details until he implicated Mr. Miller. Detectives falsely denied their misconduct and Mr. Miller was convicted in 1998. In the 10 years following Mr. Miller's conviction, investigation unearthed new evidence demonstrating Mr. Miller's innocence, including evidence corroborating Mr. Williams's assertion that the statements attributed to him by the police were false and coerced. Nevertheless, the PPD failed to

investigate. In 2019, the federal district court vacated Mr. Miller's conviction and the Philadelphia District Attorney's Office subsequently dismissed all charges, stating that Mr. Miller had "met his burden of proving his innocence."

150.   **Eugene Gilyard and Lance Felder:** In 1998, Mr. Gilyard and Mr. Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During an investigation over two years after the crime, PPD detectives, including Dennis Dusack, one of the defendants in this case, fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Mr. Gilyard and Mr. Felder. For example, after witness Keith Williams initially told detectives that Mr. Felder was not a person he had seen at the time of the crime, detectives coerced Mr. Williams to identify Mr. Felder's photograph by visiting Mr. Williams's home multiple times, cursing and shouting at him, and pushing on his head while pointing to Mr. Felder's photo. Similarly, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated that Mr. Harris had identified Mr. Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Mr. Gilyard and Mr. Felder's innocence, and in 2013 their convictions were vacated. In 2018, Mr. Gilyard and Mr. Felder reached a settlement with the City for their wrongful convictions.

151.   **Willie Stokes:** In 1984, PPD detectives arrested a man named Franklin Lee on rape charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified him as the person who committed that murder. Detectives insisted that Mr. Lee knew that Mr. Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Mr. Lee succumbed to the pressure and agreed to sign a false statement implicating Mr. Stokes in the murder. For years,

Mr. Lee continued to have contact with the investigating detectives who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Mr. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

152.   **Pedro Alicea:** In 1989, after failing to resolve a 1985 double homicide of Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea. To build the false case, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and coerced vulnerable individuals to obtain false identifications of Mr. Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing prison time on a number of open charges, to endorse a fabricated statement identifying Mr. Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Mr. Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Mr. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the *vacatur* of his conviction and release in 2020.

### Damages

153.   The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Plaintiff to be

improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve nearly 34 years in prison for a crime he did not commit.

154.    As a direct result of Defendants' conduct and omissions, Plaintiff sustained injuries and damages, including loss of freedom and youth for nearly 34 years between the ages of 24 and 57, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

155.    As a direct result of Defendants' conduct and omissions, Plaintiff was deprived of his familial relationships, romantic relationships, and friendships.

156.    As a direct result of Defendants' conduct and omissions, Plaintiff sustained economic injuries and damages, including loss of income and loss of career opportunities.

157.    As a direct result of Defendants' conduct and omissions, Plaintiff sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

158.    Plaintiff incorporates the preceding paragraphs by reference.

159.    The individual defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Plaintiff for the murder and assault, intentionally and/or recklessly caused Plaintiff to be arrested, charged, and prosecuted for those crimes,

Case ID: 231102648

thereby violating Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from prosecution without probable cause.

160.    The individual defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

161.    The individual defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff's clearly established constitutional rights. No reasonable officer in 1989 would have believed this conduct was lawful.

162.    The prosecution finally terminated in Plaintiff's favor on March 8, 2023, when the Philadelphia County Court of Common Pleas permitted the Commonwealth of Pennsylvania to withdraw all charges against Plaintiff.

163.    The individual defendants' acts and omissions described in the preceding paragraphs were the direct and proximate cause of Plaintiff's injuries, because they knew, or should have known, that their conduct would result in the wrongful arrest, charging, prosecution, conviction, and incarceration of Plaintiff.

### COUNT II – 42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence (against all individual defendants)

164.    Plaintiff incorporates the preceding paragraphs by reference.

165.    The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Plaintiff of his clearly established right to due process of law and a fair trial by fabricating inculpatory evidence and deliberately using coercion to

obtain inculpatory witness statements, including, without limitation, the false statement of Darryl Woods.

166. The individual defendants deprived Plaintiff of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense, including, without limitation, information regarding the true circumstances of the interrogation of Darryl Wood, and the confession of a third party.

167. The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Plaintiff clearly established constitutional rights. No reasonable officer in 1989 would have believed this conduct was lawful.

168. Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT III – 42 U.S.C. § 1983: Civil Rights Conspiracy (against all individual defendants)**

169. Plaintiff incorporates the preceding paragraphs by reference.

170. The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his clearly established Fourth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

171. In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

32

    a.   Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    b.   Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material during the pendency of this case;

    c.   Wrongfully prosecuting Plaintiff while knowing that they lacked probable cause; and

    d.   Committing perjury during hearings and trials.

172.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of

    a.   Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

    b.   Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material during the pendency of this case;

    c.   Wrongfully prosecuting Plaintiff while knowing that they lacked probable cause; and

    d.   Committing perjury during hearings and trials.

    e.   Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Bowman's wrongful arrest, charging, prosecution, conviction, and incarceration.

**COUNT IV – 42 U.S.C. § 1983: Failure to Intervene (against all individual defendants)**

171.   Plaintiff incorporates all the preceding paragraphs by reference.

172.   By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Plaintiff

33

Case ID: 231102648

to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law. Yet, with deliberate indifference, they declined to do so.

173.    These Defendants' failures to intervene violated Plaintiff's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1989 would have believed that failing to intervene to prevent these Defendants from any of the following actions was lawful: coercing and fabricating inculpatory evidence, fabricating false witness statements, withholding material exculpatory and/or impeachment evidence, or causing Plaintiff to be arrested, prosecuted, convicted, and sentenced without probable cause.

174.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest, charging, prosecution, conviction, and incarceration.

**COUNT V – 42 U.S.C. § 1983: Municipal Liability (against Defendant City of Philadelphia)**

175.    Plaintiff incorporates the preceding paragraphs by reference.

176.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Plaintiff's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular: the use of coercive techniques in interviews and interrogations to obtain inculpatory statements; the fabrication of inculpatory evidence including but not limited to witness statements; the provision of false testimony concerning the content of their investigation and witness interviews, the fabrication of

34

incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, feeding details about the crime and simple invention; and the withholding of exculpatory and impeachment evidence.

177.    The City of Philadelphia's final policymakers had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain inculpatory statements; withholding exculpatory evidence; and fabricating inculpatory evidence (e.g., fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, feeding details about the crime, and simple invention). Despite being on notice of these unconstitutional practices, policies, or customs, the City of Philadelphia failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

178.    Such unconstitutional municipal customs, practices, and / or policies were the moving force behind Plaintiff's false arrest, charging, prosecution, and more than 33 years of incarceration, as well as the other injuries and damages set forth above.

### COUNT VI – Malicious Prosecution under Pennsylvania Law (against all individual defendants)

179.    Plaintiff incorporates the preceding paragraphs by reference.

180.    The defendants, acting alone, jointly, and/or in concert and conspiracy knowingly, intentionally, negligently, maliciously and/or recklessly caused, initiated, or continued proceedings against Plaintiff's without probable cause, and the proceedings ultimately terminated in Plaintiff's favor on March 8, 2023, when the prosecution withdrew all charges against him.

181.    As a result of this malicious prosecution, Plaintiff sustained the injuries and damages set forth above.

Case ID: 231102648

**COUNT VII – Outrageous Conduct Causing Severe Emotional Distress under
Pennsylvania Law
(against all individual defendants)**

182.    Plaintiff incorporates the preceding paragraphs by reference.

183.    Defendants, acting alone, jointly, and/or in concert and conspiracy, by extreme and
outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. Bowman.

184.    The acts or omissions of the defendants as alleged in the preceding paragraphs constitute
the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Plaintiff's great
detriment and loss.

185.    As a result of the defendants' conduct, Plaintiff suffered and continues to suffer damages
as described above.

**COUNT VIII – Civil Conspiracy under Pennsylvania Law (against all individual
defendants)**

186.    Plaintiff incorporates the preceding paragraphs by reference.

187.    Defendants acting alone, jointly, and/or in concert and conspiracy committed tortious and
other unlawful acts against Plaintiff, including malicious prosecution and outrageous conduct
causing severe emotional distress.

188.    As a result of the defendants' conduct, Plaintiff suffered and continues to suffer damages
as described above.

**<u>RELIEF DEMANDED</u>**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

a.      A declaratory judgment that Defendants violated Plaintiff's rights under the
Fourth and Fourteenth Amendments and Pennsylvania law;

b.      An award of compensatory damages against all Defendants in an amount to be
determined by the finder of fact;

36

Case ID: 231102648

c.  An award of nominal damages against all Defendants in an amount to be determined by the finder of fact;

d.  An award of punitive damages against Defendants Mosley, Dusack, Koschinki and Gross in an amount to be determined by the finder of fact;

e.  Reasonable attorney's fees and costs; and,

f.  Such other and further relief as this Court deems just and proper.

**Dated:** November 22, 2023

RESPECTFULLY SUBMITTED,

/s Zak Goldstein

_____

Zak T. Goldstein, Esquire
Attorney for Plaintiff

/s Alan J. Tauber

_____

Alan Tauber, Esquire
Attorney for Plaintiff

37

Case ID: 231102648

## VERIFICATION

I, Kevin Bowman, hereby verify that the statements made in the foregoing complaint are true and correct to the best of my personal knowledge, information and belief.

This verification is made subject to the penalties of 18 Pa. C.S. §4904 related to unsworn falsification to authorities.

Dated: Nov 6, 2023

By: _____
Kevin Bowman

Exhibit "B"

City of Philadelphia Law Department                      Attorney for Defendants
Derek Kane, ESQUIRE
Deputy City Solicitor
Attorney Identification No. 316941
1515 Arch Street, 14th Floor
Philadelphia, PA  19102-1595
(215) 683-5374
(215) 683-5397 (fax)
derek.kane@phila.gov

| | | |
|---|---|---|
| **KEVIN BOWMAN,** | : | **PHILADELPHIA COUNTY** |
| | : | **COURT OF COMMON PLEAS** |
| **Plaintiff,** | : | |
| | : | **AUGUST TERM 2023** |
| **v.** | : | **No. 231102648** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

NOTICE OF FILING OF NOTICE OF REMOVAL

**To the Prothonotary:**

Pursuant to 28 U.S.C. § 1446(d), Defendant, City of Philadelphia, by and through the undersigned counsel, hereby give notice that they have filed in the United States District Court for the Eastern District of Pennsylvania the attached Notice of Removal (without exhibits) of the above-captioned action.

Pursuant to 28 U.S.C. § 1446, the filing of this Notice effects the removal of this action to the federal court, and this Court is directed to "proceed no further unless and until the case is remanded."  28 U.S.C. § 1446(d).

Respectfully submitted,

Date:  February 12, 2024                 /s/ Derek Kane
                                         Derek Kane, Esquire

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KEVIN BOWMAN | City of Philadelphia, MARLENA MOSLEY, DENNIS DUSAK,MICHAEL GROSS |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant Philadelphia |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| ALAN J. TAUBER, ESQUIRE, 718 Arch Street, Suite 702 Philadelphia, PA 19106 GOLDSTEIN, ZAK T, 1717 ARCH ST, SUITE 320 | Derek Kane, OPB, 14th floor,1515 ARCH STREET, PHILADELPHIA PA 19102 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Civil Rights Action pursuant to 4th and 14th Amendments

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2/12/2024 | |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____

---

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☐ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☐ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☐ |

I certify that, to my knowledge, the within case ☐ *is* / ☐ *is not* related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____  _____ Must sign here  _____

*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.        Federal Question Cases:*

☐  1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐  2.   FELA
☐  3.   Jones Act-Personal Injury
☐  4.   Antitrust
☐  5.   Patent
☐  6.   Labor-Management Relations
☐  7.   Civil Rights
☐  8.   Habeas Corpus
☐  9.   Securities Act(s) Cases
☐  10.  Social Security Review Cases
☐  11.  All other Federal Question Cases
        *(Please specify): _____*

*B.        Diversity Jurisdiction Cases:*

☐  1.   Insurance Contract and Other Contracts
☐  2.   Airplane Personal Injury
☐  3.   Assault, Defamation
☐  4.   Marine Personal Injury
☐  5.   Motor Vehicle Personal Injury
☐  6.   Other Personal Injury *(Please specify): _____*
☐  7.   Products Liability
☐  8.   Products Liability – Asbestos
☐  9.   All other Diversity Cases
        *(Please specify): _____*

---

### ARBITRATION CERTIFICATION
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐   Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.

☐   Relief other than monetary damages is sought.

DATE: _____  _____ Sign here if applicable  _____

*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)